BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
E. MARTIN ESTRADA
United States Attorney
ARUN G. RAO
Deputy Assistant Attorney General
AMANDA N. LISKAMM
Director, Consumer Protection Branch
LISA K. HSIAO
Assistant Director, Consumer Protection Branch
JAMES T. NELSON
Senior Trial Attorney
United States Department of Justice
Civil Division
    P.O. Box 261, Ben Franklin Station
    Washington, D.C. 20044
    Telephone:  (202) 616-2376
    Facsimile:   (202) 514-8742
    Email:      James.Nelson2@usdoj.gov
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
ROSS M. CUFF
Assistant United States Attorney
Chief, Civil Fraud Section
California State Bar No. 275093
    Room 7516, Federal Building
    300 N. Los Angeles Street
    Los Angeles, California 90012
    T: 213.894.7388 | F: 213.894.7819
    Email: ross.cuff@usdoj.gov

**Attorneys for Plaintiff United States of America**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **United States of America**, | No. |
| Plaintiff, | |
| vs. | **COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTIES, AND OTHER RELIEF** |
| **ConsumerInfo.com, Inc.**, a corporation, also d/b/a Experian Consumer Services, | |
| Defendant. | |

Plaintiff, the United States of America, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("FTC") pursuant to Section 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 56(a)(1), for its Complaint alleges:

1. Plaintiff brings this action under Sections 13(b), 16(a), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 56, 57b, and Section 7(a) of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM Act"), 15 U.S.C. § 7706(a), which authorize Plaintiff to seek and the Court to order permanent injunctive relief, civil penalties, and other relief for Defendant's acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the CAN-SPAM Act.

## SUMMARY OF CASE

2. The federal Fair Credit Reporting Act requires Defendant to allow consumers to place or remove security freezes on their credit reports free of charge. 15 U.S.C. §§ 1681c-1(i)(2)(A), 1681c-1(i)(3)(C). Defendant requires consumers who wish to manage their Experian credit report information—by, for example, freezing or unfreezing their credit—via online controls to create an account using an email address. An online account affords a fast and efficient manner in which to monitor and adjust credit activity. For consumers who create a Free Membership account rather than a Service Account, Defendant then sends to these consumers' email addresses commercial email masquerading as messages that provide account updates. These emails violate CAN-SPAM by failing to provide (1) clear and conspicuous notice of consumers' ability to request to opt out of receiving further marketing messages and (2) a mechanism for them to do so.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

4.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and (d), and 15 U.S.C. § 53(b).

## DEFENDANT

5.     Defendant ConsumerInfo.com, Inc., also doing business as Experian Consumer Services ("ECS"), is a California corporation with its principal place of business at 475 Anton Boulevard, Costa Mesa, California. ECS transacts or has transacted business in this District and throughout the United States.

## COMMERCE

6.     At all times relevant to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS ACTIVITIES

**I.     ECS's Consumer Business**

7.     ECS shares a parent company with Experian Information Solutions, Inc. ("Experian"), a credit bureau. ECS maintains the website usa.experian.com.

8.     Consumers who wish to freeze or unfreeze their Experian consumer report online—if, for example, they have been the victim of identity theft or wish to apply for a home mortgage—must create an online account. ECS offers either a Free Membership account or a Service Account. Despite the naming convention, both are free to consumers.

9.     Creating either account requires consumers to provide ECS with, among other things, an electronic mail address. Consumers who do not create an account can place or remove a freeze by telephoning Experian or sending a request by mail.

10.     ECS uses the electronic mail addresses it obtains from consumers who create a Free Membership account to promote products and services by sending emails that include credit card offers, pitches of services to improve their credit

score, offers of discounts and savings on auto-related services and products, and upsells for ECS's paid memberships, such as IdentityWorks℠ Premium.

11.    Establishing a Free Membership account is a prerequisite to using certain services ECS offers through the website. One such service is Experian Boost, which asserts that it can help consumers raise their FICO credit scores on their Experian credit reports and avail themselves of improved credit card offers.

12.    Notwithstanding their clear promotional purpose and content, ECS represents that these emails: (a) are "not [ ] marketing email[s]"; (b) are sent to "notify [the consumer] of a recent change to [their] account"; and (c) "contain important information about [a consumer's] account."

13.    ECS sends these emails even to consumers who have specifically opted out of receiving emails containing "Personalized insights and offers" that include "tips about building credit and managing finances."

14.    Three of Defendant's email marketing campaigns to consumers who establish a Free Membership account—"Confirm your car," "Experian Boost," and "Dark Web Scan"—are described below.

**II.    Confirm Your Car Emails**

15.    ECS sent numerous "Confirm your car" emails to consumers in 2022. Consumers have received multiple emails referring to one or more vehicles or asking them to "[s]ign in to confirm [their] car."

16.    An example of a "Confirm your car" email, attached hereto as **Exhibit A** and incorporated herein, comes from "Experian" at the email address "support@s.usa.experian.com."

17.    In this email, shown in the image from Exhibit A below, the subject line reads as follows: "[Name], Do you own a Ford F-150?" Below an ombre border is an illustration of an automobile with a question mark beside it.



18.    As shown in the image below, which is another iteration of the email in Exhibit A, the email continues by prompting consumers to click on a hyperlink labeled "See details."



# Do you own a 2011 Ford?

We found a 2011 Ford matching the address on your Experian membership. Confirm it's your car to get started with free benefits like insurance savings, data on your car's history, and estimated value.

See details

Doing so prompts consumers to log in to their Experian account.

19.     ECS has also sent numerous consumers another type of "Confirm your car" email with the subject line "[Name], Vehicle detected," an example of which is attached hereto as **Exhibit B** and incorporated herein.

20.     As in the emails described above—and as shown in the image from Exhibit B below, the Experian logo appears in color in the upper left corner of the body of this email. Below an ombre border is an illustration of an automobile with a yellow arrow pointing to it.



21.     As shown in the image from Exhibit B below, the message then urges consumers to "[s]ign in to confirm your car" and purportedly alerts them to a "match" with a vehicle. Below this statement is a pink call-to-action button that states "Sign in."



22.     Each of the "Confirm your car" emails concludes with the content shown in the image below:

    

This email was sent because it contains important information about your account. Please note that if you have previously unsubscribed from Experian CreditWorks℠ Basic, you will no longer receive newsletters or special offers. However, you will continue to receive email notifications regarding your account. To ensure that you'll receive emails from us, please add support@e.usa.experian.com to your address book.

Privacy Policy

© 2022 Fair Isaac Corporation. FICO® is a trademark of Fair Isaac Corporation.

© 2022 ConsumerInfo.com, Inc., an Experian® company. All rights reserved.
P.O. Box 2390 Allen, TX, 75013, US



23.     Beneath hyperlinked logos of five social media platforms is the following:

> This email was sent because it contains important information about your account. Please note that if you have previously unsubscribed from Experian CreditWorks℠ Basic, you will no longer receive newsletters or special offers. However, you will continue to receive email notifications regarding your account. To ensure that you'll receive emails from us, please add support@e.usa.experian.com to your address book.

24.     The emails do not contain an "Unsubscribe" link.

25.     Contrary to what the emails say, they do not "contain[] important information about [the recipient's] account." Furthermore, they tell consumers who have already told ECS that they wish to opt out of marketing messages that ECS will not honor their request because the message purports to be an "email notification[] regarding [the recipient's] account." ECS even goes one step further and advises consumers to add the email address from which ECS sent the emails to the recipients' email address book to make sure they continue to receive ECS's marketing emails.

26.     The primary purpose of these emails is to promote auto-related offers and ECS's commercial website. Nevertheless, the emails do not provide notice of consumers' ability to opt out of receiving further promotional messages or a mechanism for doing so.

27.     Numerous consumers have complained about the "Confirm your car" emails. Among other things, consumers have stated that: (a) the emails are unwanted marketing emails; (b) they are unable to unsubscribe from these emails despite substantial efforts; (c) the vehicles referred to in the emails and on ECS's website appear to be fake or are not associated with them in any way; (d) the vehicles listed are many years old and long paid for; (e) the vehicles listed have

nothing to do with them; their identity; their credit profile, status, or history; or their desire to freeze or unfreeze their credit; (f) they were unable to remove the vehicles from their account without agreeing to share their personal information with third-party marketers and/or provide information about the vehicles they own that could be used for marketing purposes; and (g) they believed the inclusion of the cars on their Experian account constituted incorrect information on their credit record which they wanted and needed to dispute.

**III.   Experian Boost Email**

28.   Experian also widely advertises, including on the Internet and television, a service called "Experian Boost." Consumers who wish to use Experian Boost must first create a Free Membership account with ECS, although advertisements do not disclose this requirement.

29.   Shortly after consumers sign up for a Free Membership account—including consumers who have signed up solely for the purpose of freezing or unfreezing their credit—ECS sends them an email touting Experian Boost and encouraging consumers to "[u]nlock offers." One version of such an email, an example of which is attached hereto as **Exhibit C** and incorporated herein, also comes from "Experian" at the email address "support@s.usa.experian.com."

30.   As shown in the image from Exhibit C below, the subject line of the email reads, "Instantly increase your FICO® Score (yep, you read that right!)," and the top of the message contains a link for a consumer to sign in to their Experian account.



31.     As shown in the image immediately below, beneath the message's ombre border is a heading in large dark gray type: "Don't just check your FICO® Score*. Boost it!" The message continues with a one-sentence explanation of Experian Boost, followed by a large purple button reading "Boost your FICO Score>[.]"

# Don't just check your FICO® Score*. Boost it!

Now with Experian Boost, your FICO® Score can benefit from the bills you already pay but haven't been getting credit for.

Boost your FICO Score ›

Clicking on the button prompts consumers to log in to their Experian account.

32.     The email continues below the purple button with an animated graphic, shown immediately below, of a cell phone displaying the heading "Nice work!" above a credit score within a semicircle rating scores from "poor" to "exceptional." On both sides of the graphic is a blue background sprinkled with an animated shower of confetti.



33.     As shown in part immediately below, the animated graphic continues with "You got a +22 point Boost!" and a purple call-to-action button.



34.     The body of the email continues with a heading stating, "Here's how it works," followed by headers setting out three steps.

35.     As shown below, beneath these headers is a prominent purple button that reads "Boost your FICO Score >[.]"



See your fabulous, newly boosted FICO Score

Boost your FICO Score >

Clicking on the button takes a consumer to a webpage that prompts them to enter the username and password of their Experian account.

36.     The email continues, as shown in the image below, and beneath the button are a blue lightbulb icon and a brief explanation of what a higher credit score can provide.



What can you get with a higher credit score?

A higher score means more control and options. For starters, you can gain access to better offers and lower interest rates!

Unlock offers >

1   The following hyperlinked text "Unlock offers >" directs consumers to the same

2   webpage where they must log in to their Experian account.

3        37.    Details about the results of using Experian Boost sit beneath the

4   hyperlink.

5        38.    The email concludes with the content shown in the image below:

This email was sent because it contains important information about your account. Please note that if you have previously unsubscribed from Experian CreditWorks℠ Basic, you will no longer receive newsletters or special offers. However, you will continue to receive email notifications regarding your account. To ensure that you'll receive emails from us, please add support@e.usa.experian.com to your address book.

Privacy Policy

© 2022 Fair Isaac Corporation. FICO® is a trademark of Fair Isaac Corporation.

© 2022 ConsumerInfo.com, Inc., an Experian® company. All rights reserved.
P.O. Box 2390 Allen, TX, 75013, US



18       39.    Beneath hyperlinked logos of five social media platforms is the same

19   small-print notice used in Exhibits A and B that states the email "contains

20   important information about [the recipient's] account."

21       40.    The email does not contain an "Unsubscribe" link.

22       41.    As with the "Confirm your car" emails and contrary to what the email

23   footer states, the email (a) does not "contain[] important information about [the

24   recipient's] account," (b) tells consumers ECS will not honor their previously made

25   opt-out requests, and (c) asks consumers to help ECS ensure its potentially

26   unwanted marketing messages will continue to reach them by adding ECS's email

27   address to their email address book.

28

42.     The primary purpose of this email is to promote Experian Boost, a commercial service, and ECS's commercial website. Nevertheless, the email does not provide notice of consumers' ability to opt out of receiving further promotional messages or a mechanism for doing so.

43.     Numerous consumers have complained that the Experian Boost emails were unwanted marketing from which they were unable to unsubscribe.

**IV.     Dark Web Scan Email**

44.     ECS also sends numerous consumers an email advertising a "Dark Web Scan" shortly after they create a Free Membership account. One such email, an example of which is attached hereto as **Exhibit D** and incorporated herein, comes from "Experian" at the email address "support@s.usa.experian.com."

45.     As shown in the image from Exhibit D below, the subject line of the email reads as follows: "[Name], your Dark Web scan is available."



46.     As shown in the image from Exhibit D below, beneath an ombre border is a logo showing a fingerprint and an adjacent caution sign, a heading in large gray type reads, "You have a free Dark Web scan available." The message continues by asking, "Don't you want to know if your info is compromised?" Immediately below this text sits a prominent purple button that reads "Run scan now >[.]"

14

1
2
3
4
5
6
7
8
9
10



## You have a free Dark Web scan available

We will scan over 600,000 data points on the Dark Web for your SSN, email address and more. Don't you want to know if your info is compromised?

**Run scan now ›**

11    47.    As shown in the image from Exhibit D immediately below, the email

12    continues with the logos of five social media services and small-print text:

13
14
15

    

16    **Why am I receiving this email?**

This is not a marketing email—you're receiving this message to notify you of a recent change to

17    your account. If you've unsubscribed from Experian CreditWorks℠ Basic emails in the past, don't

worry—you no longer receive newsletters or special offers.

18
19    You can update some alerts and communications preferences any time on your Experian

CreditWorks℠ Basic profile, but you'll continue to receive notifications like this one on the status

20    of your account.

21    To ensure that you'll stay up to date on account notifications, add support@e.usa.experian.com

22    to your address book and avoid marking these messages as spam.

23    48.    At the very bottom of the email, beneath the question "Why am I

24    receiving this email?" sits the following text:

25    This is not a marketing email—you're receiving this message to

26    notify you of a recent change to your account. If you've

27    unsubscribed from Experian CreditWorks℠ Basic emails, in the

28

1  past, don't worry—you no longer receive newsletters or special
2  offers.
3  You can update some alerts and communications preferences any
4  time on your Experian CreditWorks℠ Basic profile, but you'll
5  continue to receive notifications like this one on the status of
6  your account.
7  To ensure that you'll stay up to date on account notifications, add
8  support@e.usa.experian.com to your address book and avoid
9  marking these messages as spam.

10  49.    Contrary to the text of the email's footer, the message is "a marketing
11  email" and was not sent to notify the recipient of a "recent change to [the
12  recipient's] account." As with the "Confirm your car" and "Experian Boost"
13  emails, the message continues by telling recipients that they cannot opt out of these
14  messages because they are "notifications . . . on the status of [the recipient's]
15  account" and requests assistance in continuing to deliver these emails to their
16  inboxes by adding the "from" address to their email address book.

17  50.    The email concludes as shown in the image from Exhibit D below.

18  Privacy Policy

19  View Your Consumer Right to Obtain a Security Freeze

20  © 2022 Fair Isaac Corporation. FICO® is a trademark of Fair Isaac Corporation.
21
22  © 2022 ConsumerInfo.com, Inc., an Experian® company. All rights reserved.
   P.O. Box 2390 Allen, TX, 75013, US
23
24  
25
26  51.    It does not contain an "Unsubscribe" link.
27  52.    Clicking on the purple button identified in Paragraph 46 prompts a
28  consumer to enter the username and password of their Experian account. After

providing that information, the consumer is brought to a screen, shown below, offering a negative-option trial of "Experian Identity Theft Protection." Fine print near the bottom of the screen explains that the offer is for a 30-day "trial membership" of "Experian IdentityWorks℠ Premium." If consumers fail to cancel their membership before the end of the trial, they will be charged $19.99 plus sales tax per month until they cancel. Consumers on this page can select one of two buttons: a black button reading "Buy with [payment type]" or a blue button that says "No, Keep My Current Membership."



53.    Clicking on the blue button brings consumers to a screen titled "Identity Protection," shown below:



54.     In a box labeled "Your alerts" is the following text: "See if your personal info is exposed on the web[.] Personal privacy scan shows if your address, phone number or other personal info is compromised online and provides insights on what to do next." Beneath that text are a purple button that says, "Scan now for free" and a white button that says, "Learn more."

55.     Clicking on the purple "Scan now for free" button brings up a popup, shown below, that requires consumers to consent to Experian's Terms and Conditions and Privacy Policy, and to agree to share personal information from their account profile with third parties to continue.



56.     The primary purpose of this email is to promote Experian's Dark Web Scan, a commercial service, and ECS's commercial website. Nevertheless, the email does not provide notice of consumers' ability to opt out of receiving further promotional messages or a mechanism for doing so.

57.     Numerous consumers have complained that the Dark Web Scan emails were unwanted marketing from which they were unable to unsubscribe.

**V.    Consumers' Communication Preferences**

58.     As shown in the image below, on an Experian account page entitled "Communication preferences," consumers are able to opt in or out of receiving emails containing "Personalized insights and offers" that included "tips about

19

1   building credit and managing finances." Many consumers have complained that

2   they opted out of such communications but continued to receive marketing emails

3   like those referenced above, in contravention of their stated preferences.



59.    Based on the facts and violations of law alleged in this Complaint, Plaintiff has reason to believe that Defendant is violating or is about to violate laws enforced by the Commission.

**VIOLATIONS OF THE CAN-SPAM ACT**

60.    The CAN-SPAM Act became effective on January 1, 2004.

61.    Section 5(a)(3)(A) of the CAN-SPAM Act states:

It is unlawful for any person to initiate the transmission to a protected computer of a commercial electronic mail message that does not contain a functioning return electronic mail address or other Internet-based mechanism, clearly and conspicuously displayed that—

(i) a recipient may use to submit, in a manner specified in the message, a reply electronic mail message or other form of Internet-based communication requesting not to receive future commercial electronic mail messages from that sender at the electronic mail address where the message was received; and

(ii) remains capable of receiving such messages or communications for no less than 30 days after the transmission of the original message.

15 U.S.C. § 7704(a)(3)(A).

62.    Section 5(a)(5)(A)(ii) states: "It is unlawful for any person to initiate the transmission of any commercial electronic mail message to a protected computer unless the message provides—. . . (ii) clear and conspicuous notice of the opportunity under paragraph (3) to decline to receive further commercial electronic mail messages from the sender . . . ." 15 U.S.C. § 7704(a)(5)(A)(ii).

63.    A "commercial electronic mail message" is "any electronic mail message the primary purpose of which is the commercial advertisement or promotion of a commercial product or service (including content on an Internet

website operated for a commercial purpose).” 15 U.S.C. § 7702(2)(A). “The term ‘commercial electronic mail message’ does not include a transactional or relationship message.” 15 U.S.C. § 7702(2)(B).

64.    A “transactional or relationship message” is:

an electronic mail message the primary purpose of which is—

(i) to facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into with the sender;

(ii) to provide warranty information, product recall information, or safety or security information with respect to a commercial product or service used or purchased by the recipient;

(iii) to provide—

(I) notification concerning a change in the terms or features of;

(II) notification of a change in the recipient’s standing or status with respect to; or

(III) at regular periodic intervals, account balance information or other type of account statement with respect to

a subscription, membership, account, loan, or comparable ongoing commercial relationship involving the ongoing purchase or use by the recipient of products or services offered by the sender;

(iv) to provide information directly related to an employment relationship or benefit plan in which the recipient is currently involved, participating, or enrolled; or

(v) to deliver goods or services, including product updates or upgrades, that the recipient is entitled to receive under the terms

1          of a transaction that the recipient has previously agreed to enter

2          into with the sender.

3    15 U.S.C. § 7702(17)(A).

4          65.    In 2005, pursuant to the CAN-SPAM Act's grant of authority, the

5    Commission issued rule provisions that define the relevant criteria for determining

6    the "primary purpose" of an electronic mail message. That rule states that the

7    primary purpose of an electronic mail message is commercial in the following

8    circumstances:

9          (1) If an electronic mail message consists exclusively of the

10         commercial advertisement or promotion of a commercial product

11         or service, then the "primary purpose" of the message shall be

12         deemed to be commercial.

13         (2) If an electronic mail message contains both the commercial

14         advertisement or promotion of a commercial product or service

15         as well as transactional or relationship content as set forth in

16         paragraph (c) of [Section 316.3], then the "primary purpose" of

17         the message shall be deemed to be commercial if:

18             (i) A recipient reasonably interpreting the subject line of the

19             electronic mail message would likely conclude that the

20             message contains the commercial advertisement or promotion

21             of a commercial product or service; or

22             (ii) the electronic mail message's transactional or relationship

23             content as set forth in paragraph (c) of [Section 316.3] does

24             *not* appear, in whole or in substantial part, at the beginning of

25             the body of the message.

26         (3) If an electronic mail message contains both the commercial

27         advertisement or promotion of a commercial product or service

28         as well as other content that is not transactional or relationship

content as set forth in paragraph (c) of [Section 316.3], then the "primary purpose" of the message shall be deemed to be commercial if:

>   (i) A recipient reasonably interpreting the subject line of the electronic mail message would likely conclude that the message contains the commercial advertisement or promotion of a commercial product or service; or

>   (ii) A recipient reasonably interpreting the body of the message would likely conclude that the primary purpose of the message is the commercial advertisement or promotion of a commercial product or service. Factors illustrative of those relevant to this interpretation include the placement of content that is the commercial advertisement or promotion of a commercial product or service, in whole or in substantial part, at the beginning of the body of the message; the proportion of the message dedicated to such content; and how color, graphics, type size, and style are used to highlight commercial content.

16 C.F.R. § 316.3(a)(1)–(3) (emphasis in original).

66.     Pursuant to Section 7(a) of the CAN-SPAM Act, 15 U.S.C. § 7706(a), and Section 18(a)(1)(B) of the FTC Act, 15 U.S.C. § 57a(a)(1)(B), a violation of the CAN-SPAM Act constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT I**

**Failure to Provide Opt-Out Mechanism**

67.     In numerous instances, Defendant has initiated the transmission to protected computers of commercial electronic mail messages that did not contain a functioning return electronic mail address or other Internet-based mechanism,

1   clearly and conspicuously displayed, that a recipient may use to submit a request
2   not to receive future commercial electronic mail messages from that sender at the
3   electronic mail address where the message was received.

4      68. Therefore, Defendant's acts or practices as set forth in Paragraph 67
5   violate Section 5(a)(3)(A) of the CAN-SPAM Act, 15 U.S.C. § 7704(a)(3)(A).

6      69. Defendant's violations of Section 5(a)(3)(A) of the CAN-SPAM Act,
7   15 U.S.C. § 7704(a)(3)(A), were committed with the knowledge required by
8   Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

9   **COUNT II**
10  **Failure to Provide Notice of Opt-Out**

11     70. In numerous instances, Defendant has initiated the transmission to
12  protected computers of commercial electronic mail messages that did not contain
13  clear and conspicuous notice of the opportunity under 15 U.S.C.
14  § 7704(a)(5)(A)(ii) to decline to receive further commercial electronic mail
15  messages from the sender.

16     71. Therefore, Defendant's acts or practices as set forth in Paragraph 70
17  violate Section 5(a)(5)(A)(ii) of the CAN-SPAM Act, 15 U.S.C.
18  § 7704(a)(5)(A)(ii).

19     72. Defendant's violations of Section 5(a)(5)(A)(ii) of the CAN-SPAM
20  Act, 15 U.S.C. § 7704(a)(5)(A)(ii), were committed with the knowledge required
21  by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

22  **CONSUMER INJURY**

23     73. Consumers have suffered and will continue to suffer substantial injury
24  as a result of Defendant's violations of the CAN-SPAM Act and the FTC Act.
25  Absent injunctive relief by this Court, Defendant is likely to continue to injure
26  consumers and harm the public interest.

27  **PRAYER FOR RELIEF**

28     Wherefore, Plaintiff requests that the Court:

A.   Enter a permanent injunction to prevent future violations of the CAN-SPAM Act and the FTC Act by Defendant;

B.   Award Plaintiff monetary civil penalties from Defendant for every violation of the CAN-SPAM Act; and

C.   Award any additional relief as the Court determines to be just and proper.

Dated: August 14, 2023                    Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
E. MARTIN ESTRADA
United States Attorney

ARUN G. RAO
Deputy Assistant Attorney General
AMANDA N. LISKAMM
Director, Consumer Protection Branch
LISA K. HSIAO
Assistant Director,
Consumer Protection Branch
United States Department of Justice
Civil Division

DAVID M. HARRIS, AUSA
Chief, Civil Division
ROSS M. CUFF, AUSA
Chief, Civil Fraud Section

*/s/ James T. Nelson*
JAMES T. NELSON
Senior Trial Attorney
United States Department of Justice
Civil Division

Of Counsel:

FRANCES L. KERN
ELSIE B. KAPPLER
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2391/fkern@ftc.gov
(202) 326-2466/ekappler@ftc.gov